However, the boxes seized from defendants provide a different look when opened. The boxes are obviously glued shut by hand. As depicted below, no glue lines are visible because the glue is not applied mechanically and is rather simply smeared onto the flaps. See Chan Decl. ¶ 51.



**D.   The Authorization of Manufacturing and
      Importation of Counterfeit Goods by Jimmy Zhan**

According to the documents seized, defendant Jimmy Zhan ordered 350 cases of 6x5lb cans of Koon Chun Hoisin sauce from Mr. Cheung of Tin Shing Trading Co. (Tin Shing) around March 20, 2002 at a price of $20.80. (See Coppola Decl. Exh. 5) This transaction matches the business record of Koon Chun and the order was filled with genuine Koon Chun product. (Coppola Decl. Exh. 6) According to the business records of Koon Chun, Mr. Cheung of Tin Sing (nor anyone else from Tin Shing) never ordered any product from Koon Chun since after that time. Chan Decl. ¶ 55.

In the seized documents, there is a Koon Chun price list sent by fax from Tin Shing on February 23, 2002. (See Coppola Decl. Exh. 7) On the price list, there are phone numbers and fax numbers of Koon Chun. This indicates that Jimmy Zhan was fully aware of the source and pricing of genuine Koon Chun products in as early as February 2002.

From November 2002 to January 2004, Star Mark purchased 3 containers of various Koon Chun products – but <u>no</u> five (5) pound can of Hoisin sauce – on three different occasions through

its supplier, Mr. Kwong of New United Trading Company ("New United"). Those purchases were supplied by Koon Chun. On May 26, 2004, New United placed an order for one container of various Koon Chun products but never took delivery.[8/]

Beginning on July 3, 2002, Jimmy Zhan, while he was also purchasing genuine Koon Chun products (except Hoisin sauce), directly wrote to the Xin Hua Food Factory in China to order counterfeit Koon Chun Hoisin sauce.[9/] Mr. Zhan seemed to have some quality issues with the counterfeits in the beginning. On January 15, 2003 Mr. Zhan wrote to He Lin of Xin Hua Food Factory and copied to Mr. Kwong:

"About the Koon Chun Hoisin sauce that has arrived this time, $15.75 is a bit expensive. If the price can be made better, [you can] help me arrange a shipment of 3000 – 5000 cases before March. **The taste must be similar. It would be good if the paper box can be made harder. It would be better if the "nutrition facts table" can be printed on it!**" (Emphasis added)[10/]

On August 4, 2003 Mr. Zhan wrote to Mr. Kwong of New United, in his order and price confirmation for genuine Koon Chun products (but with no five-pound cans of Hoisin sauce):

"Mr. Kwong, I understand this price will be difficult to do for both of us, but **for the facilitation of the future mass import of 5lb cans of Hoisin Sauce, then both of us need to make some sacrifice**. Hope you can understand! Thank you for your cooperation!" (Emphasis added) See Coppola Decl. Exh. 8 (SM0695-696)

---

[8/]    See Coppola Decl. Exh. 8 (which are a collection of various production documents bearing Bates Nos. KC009, SM0272, SM0273, DSC0165-166; KC0010-11, SM254, SM0695-96, DSC0190-192; KC0012-13, SM0668; KC0014-15).

[9/]    See Coppola Decl. Exh. 9 (a certified translation of this document is annexed to the back of the original document).

[10/]   See Coppola Decl. Exh. 10 (a certified translation of this document is annexed to the back of the original document).

The fax messages indicate that Mr. Zhan knew what he was buying and that it was not genuine. He was instructing the alleged counterfeit manufacturer to make the taste similar and to make the box harder to correct the quality problems of the counterfeits. At the same time, he was ordering other items of genuine Koon Chun products (except for five-pound cans of Hoisin sauce) so that he could sell the counterfeit goods together with other genuine Koon Chun products to avoid suspicion from his customers.

Moreover, in his December 13, 2005 deposition Mr. Zhan testified that he knew the Koon Chun Hoisin sauce he bought was manufactured from China because the cost was lower there.[11]

As well, Mr. Zhan testified at his deposition that he was aware that Koon Chun was a Hong Kong company whose goods were manufactured in Hong Kong.[12] Despite Mr. Zhan's knowledge of these facts, he did not explain why he dealt with companies and individuals in mainland China to purchase Koon Chun Hoisin sauce (while he was also buying genuine Koon Chun products from Hong Kong). Mr. Zhan attempts to explain this fact by claiming that he thought he was dealing with Koon Chun's authorized distributor and representatives.[13] However, the faxes show that Mr. Zhan knowingly used the same vendors who have purchased genuine Koon Chun products to supply him with counterfeit Koon Chun products.[14] Koon Chun has never authorized any other company to use the KOON CHUN Trademark or trade dress or to manufacture product bearing the KOON CHUN Trademark and use it on their own behalf. Chan Decl. ¶ 10.

---

[11] See p. 289, lines 4 - 18 from December 30, 2005 the deposition of Yi Q. (a/k/a Jimmy) Zhan annexed as Coppola Decl. Exh. 11.

[12] See Zhan Depo. at pp. 94, line 18 - 95, line 14 (Coppola Decl. 12).

[13] See Zhan Depo. at pp. 317, line 23 - 318, line 12 (Coppola Decl. Exh. 11)

[14] In Star Mark's Amended Answer to Plaintiff's Interrogatory, dated May 27, 2005 (at p. 2) defendants claimed that for the period of 2001 to the present, they imported 5,385 cases of hoisin sauce. Discounting the 350 cases of genuine five-pound cans of Hoisin sauce purchased from Koon Chun and the 15 + 100 cases of bottled Hoisin sauce, Defendants imported 4,920 (5,385-350-15-100=4,920) cases of 6 x 5 lb Hoisin sauce from the source of Tin Shing, New United and He Lin. While Plaintiff does not believe this number is correct the total quantity of import of alleged counterfeit is not the subject of this motion for summary judgement.


IV.     ARGUMENT

A.     **Summary Judgment Standard**

Pursuant to Fed.R.Civ.P. 56(c), a district court must grant summary judgment if the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). "Summary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), *quoting* Fed.R.Civ.P. 1.

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities and draw all inferences against the moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). However, the mere existence of disputed factual issues is insufficient to defeat a motion for summary judgment. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir.1986), *cert. denied*, 480 U.S. 932 (1987). The disputed issues of fact must be "material to the outcome of the litigation" (*id.* at 11), and must be backed by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* With respect to materiality, "substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. This standard applies with equal force in trademark infringement cases under the Lanham Act. *See, e.g., Coach Leatherware Co., Inc. v. Ann Taylor, Inc.*, 933 F.2d 162, 166-67 (2d Cir.1991); *Lang v. Retirement Living Publ'g Co., Inc.*, 949 F.2d 576, 580 (2d Cir.1991).

B.   **Trade Mark and Trade Dress Infringement and Counterfeiting**

    i.    **Legal Standard**

Koon Chun alleges that defendants violated sections 15 U.S.C. § 1114, 1116 and 1125(a) of the Lanham Act, through defendants' counterfeiting activities. The legal standards for trademark counterfeiting and infringement is governed by 15 U.S.C. § 1114(1)(a), which provides that:

> a person shall be civilly liable if, without the registrant's consent, such person: use[s] in commerce any reproduction, counterfeit, copy or colorable limitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1125(a) deems liable for trade dress counterfeiting and infringement,

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ⋯ is likely to cause confusion ....

15 U.S.C. § 1116(d)(1)(B)(i) defines a "counterfeit mark" as

> a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered.

A plaintiff will prevail on its claims for trademark counterfeiting and infringement under § 1114(1)(a), and trade dress counterfeiting and infringement under § 1125(a), if it successfully establishes that: (1) defendant had a valid mark entitled to protection under the Lanham Act; and (2) defendants' used a similar mark in commerce in a way that would likely cause confusion among the relevant consuming public. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F.Supp.2d 448, 454 (S.D.N.Y. 2005), *citing Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir.1995) (noting that the standard is the same for claims under both sections 1114(1)(a) and 1125(a) of the Lanham Act); *see also Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F.Supp.2d 284, 287

(S.D.N.Y.2003) ("*Gucci America I*"); *K2 Advisors, LLC v. K2 Volatility Fund L.P.*, No. 02 Civ. 3984, 2002 WL 31235701, at *7-8, 2002 U.S. Dist. LEXIS 18801, at *20 (S.D.N.Y. Oct. 4, 2002); *Nike, Inc. v. Top Brand Company Ltd.*, 2005 WL 1654859, *4-5 (S.D.N.Y. Jul. 13, 2005), *citing Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

### ii. Whether Trademark is Protected

"A certificate of registration with the Patent and Trademark Office is *prima facie* evidence that the mark is registered and valid (i.e. protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Danone Asia PTE. Ltd. v. Happy Dragon Wholesale, Inc.*, 2006 WL 845573, *5 (E.D.N.Y. Mar. 29, 2006), *quoting Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); 15 U.S.C. § 1067(b) ("A certificate of registration of a mark … shall be prima facie evidence of the validity of the registered mark").

Thus the Koon Chun Trademark is entitled to protection. As well, it is presumed valid and only the plaintiff is entitled to use it.

### iii. Whether Defendants' Product is Counterfeit

In addition to the definition set forth in section 1116, the Lanham Act also defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. In *Consolidated Cigar Corp. v. Monte Cristi De Tabacos*, 58 F.Supp.2d 188, 196 (S.D.N.Y. 1999), the Court granted summary judgment in favor of the plaintiff for trade dress counterfeiting where the defendant's packaging was nearly identical to the plaintiff's registered mark, with only minor differences which would not be apparent to an unwary observer.

### iv. Whether the Counterfeit Marks Create a Likelihood of Confusion

When considering the likelihood of confusion, courts in the Second Circuit consider the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir.1961). However, in cases, such as the present one, where counterfeit marks are involved, it is

not "necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Philip Morris USA Inc. v. Felizardo,* No. 03 Civ. 5891, 2004 WL 1375277 at *5, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004); *see also Gucci America I,* 286 F.Supp.2d at 287 (noting that "confusing the customer is the whole purpose of creating counterfeit goods") (*citing Topps Co., Inc. v. Gerrit J. Verburg Co.,* No. 96 Civ. 7302, 1996 WL 719381 at *6, 1996 U.S. Dist. LEXIS 18556, at *18 (S.D.N.Y. Dec. 13, 1996) (noting that "where the marks are identical, and the goods are also identical and directly competitive" a consideration of the *Polaroid* factors is unnecessary)).

### C. Willfulness

#### i. Legal Standard

Section 1117(b) of the Lanham Act provides for treble damages when a defendant intentionally uses "a mark or designation, knowing such mark or designation is a counterfeit mark … in connection with the sale, offering for sale, or distribution of goods or services." Willful blindness is sufficient to satisfy section 1117(b)'s intent requirement because "willful blindness is knowledge itself." *Tanning Research Laboratories, Inc. v. Worldwide Import & Export Corp.*, 803 F.Supp. 606, 610 (E.D.N.Y. 1992), *quoting Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989); *see also Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 315 F.Supp.2d 511, 521-522 (S.D.N.Y. 2004); *Nike, Inc. v. Top Brand Co. Ltd.*, 2005 WL 1654859, *6 (S.D.N.Y. 2005).

"The standard for willfulness is 'whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility.'" *Id., citing Kepner-Treqoe, Inc. v. Vroom*, 186 F.3d 283, 288 (2d Cir. 1999) (*quoting Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993)); *see also Louis Vuitton*, 875 F.2d at 590 (to be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate). In *Nike*, plaintiff relied on admissions made by defendant during his deposition testimony and the Court found for willfulness. Although defendant stated that he believed he was dealing with authorized

licensees, he failed to identify the purported licensees, identify any basis for this supposed belief, refer to a single conversation with the supposed licensees or identify any steps he took to verify that the alleged client was an authorized licensee or attach a single document to, from or relating to the supposed licensees. *Nike*, 2005 WL 1654859 at *7.

Under the doctrine of willful blindness, "knowledge can be imputed to a party who knows of a high probability of illegal conduct and purposefully contrives to avoid learning of it." *Williams v. Obstfeld*, 314 F.3d 1270, 1271 (11th Cir.2002); see also *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149 (7th Cir.1992) (to be willfully blind, person "must suspect wrongdoing and deliberately fail to investigate").

### D. The Cans Imported and Sold by Defendants are Counterfeits and Infringe Koon Chun's Trademarks and Trade Dress

In a flagrant disregard for Plaintiff's trademark and trade dress rights Defendants have blatantly replicated the Plaintiff's container for its world-known products. Without so much as a half-hearted effort to create some distinction between its own products and plaintiff's – and, indeed, with the intent to counterfeit plaintiff's goods -- defendants have duplicated plaintiff's containers and attempted to sell their goods to purchasers as if they were plaintiff's authentic goods.

As there is no question that the Defendants' Goods exactly duplicate Koon Chun's Trademark and trade dress for all intents and purposes (except for the tell-tale time/date stamp and some differences in some fonts), there is no reason to go through the step-by-step examination of each *Polaroid* factor. As stated in *Philip Morris USA*, such an analysis is not necessary because counterfeit marks are inherently confusing. *Phillip Morris USA*, 2004 U.S. Dist. LEXIS 11154, at *18 (S.D.N.Y. June 18, 2004). As the goods are directly comparative, one need only look at the Defendants' Goods and compare them to Plaintiff's to reach the conclusion that infringement has occurred.

All of Plaintiff's goods bear the distinctive wording and design of its federally registered trademark "KOON CHUN SAUCE FACTORY." The trademark contains a distinctive script font with red lettering and a yellow border in association with a blue trapezoidal background and a circular seal bearing a green and blue ancient Chinese wine glass. The products sold by the defendants bear these identical markings and intentionally use the Plaintiff's long established name, reputation and good will to sell its products. Indeed, defendants' defense, unpersuasive as it is, is that eventually they thought they were buying genuine counterfeit goods. It is hard for defendants to deny the likelihood of confusion when even they claim (incredibly) that they were confused.

There are several ways which have been established by the plaintiff to differentiate between the genuine and counterfeit products. Specifically, the date and time stamping used by plaintiff is not replicated in the products imported and sold by the defendants. The appearance of some of the Chinese characters on the Defendants' goods are different from those on the plaintiff's genuine product. Moreover, the boxes in which the Defendants' Goods were packaged did not utilize the same automated gluing method by which containers of authentic Koon Chun goods are sealed.

Defendants have failed to refute any of these facts and indeed cannot do so. Any argument by defendants that the differences are not readily noticeable by consumers is a non-sequiteur since that is precisely what a counterfeit is - an attempt to replicate something that cannot be detected by a consumer. Indeed, the *Consolidated Cigar Corp.* case is directly on point on this issue by holding that summary judgment for trade dress counterfeiting is proper where the defendant's packaging was nearly identical to the plaintiff's registered mark, with only minor differences that were not apparent to an unwary consumer. *Consolidated Cigar Corp.*, 58 F.Supp.2d at 196.

Given the foregoing, there is no question that the goods sold by the defendants are counterfeit and summary judgment should be granted on this issue along with the issues of trademark and trade dress infringement and counterfeiting.

E.     **Defendants Star Mark and Zhan Acted Wilfully or With <u>Willful Blindness of the Counterfeiting of Koon Chun's Trade Mark</u>**

The two fax messages (Coppola Exhs. 8 (SM0695 - SM0696) and 10) and the fact that Mr. Zhan was importing counterfeit Koon Chun Hoisin sauce from China while during the same period, kept buying other Koon Chun products (except for five-pound cans of Hoisin sauce) from Koon Chun in Hong Kong are clear evidence that Mr. Zhan knowingly ordered the manufacturing of counterfeit Koon Chun Hoisin sauce in China or was at least blind to the fact that he was importing counterfeit goods.

Mr. Zhan is at least willfully blind in the following five situations:

1.     The goods Mr. Zhan bought from China (from suppliers named Tin Shing, New United and Mr. He Lin) were of an obvious poor quality (evidenced by Mr. Zhan's insistence that his suppliers in China to make the goods taste better and have stronger boxes).[15] Despite this fact, Zhan did not investigate the reason for this and indeed turned a blind eye to such knowledge and continued to purchase goods from these suppliers – after offering his own suggestions on how to improve the counterfeits. By turning a blind eye to this fact, Mr. Zhan has willfully infringed Plaintiff's trademark and counterfeited Koon Chun's Hoisin sauce product and summary judgment on this issue should be granted.

2.     As well, Mr. Zhan testified at his deposition that he was aware that Koon Chun was a Hong Kong company whose goods were manufactured in Hong Kong.[16] Despite Mr. Zhan's knowledge of these facts, he still did not question why he was dealing with companies and individuals in mainland China or why the goods purchased were not of the same high quality as the genuine goods he had previously purchased from Koon Chun in Hong Kong. Mr. Zhan attempts to

---

[15]    See Coppola Decl. Exh. 10.

[16]    See the December 21, 2005 deposition of Yi Q. (a/k/a Jimmy) Zhan p. 94, line 18 - p. 95, line 14. (A copy of the excerpts from the December 21, 2005 deposition of Yi Q. Zhan are annexed as Coppola Decl. Exh. 12).

explain this fact by claiming that he thought he was dealing with Koon Chun's authorized distributor and representatives.[17] However, if this were the case there would still have been no reason for Zhan to send a fax to those persons complaining of the quality of the goods and the fact that the cans did not have a nutrition label on them.[18]

    3. As well, Mr. Zhan admitted to buying the Defendants' Goods from China because they were cheaper. However, he failed to investigate why the prices were cheaper. Indeed, Mr. Zhan testified, "I did not look into it or investigate; I only care that the prices are competitive and low enough."[19]

    4. In addition, despite admitting that he knew that Koon Chun was a Hong Kong company and that its products were manufactured there, Zhan also testified that:

> At that time the price that was given by Mr. Kwong to me was too high in my view. Like the document from last time, $15.75 was too expensive. After several requests, either one, I am not sure which one said, in order for the price to be lower it would have to be manufactured from China, because the labor costs would be lower there.[20]

Despite receiving that type of response, Mr. Zhan never questioned why or how the goods could be manufactured in China when he knew that Koon Chun had no facility there. Moreover, the cans and boxes containing the Koon Chun Hoisin sauce clearly identify the goods as being made in Hong Kong. Coppola Decl. Exh. 13 and 14. Yet Mr. Zhan never questioned how the goods could possibly have been made in China when they should have been made in Hong Kong. In addition, Mr. Zhan never questioned why or how Koon Chun would possibly have charged less for an equivalent sale to the United States as this would equate to Koon Chun competing against itself.

---

[17] See Zhan Depo. at pp. 317, line 23 - 318, line 12 (Coppola Decl. Exh. 11)

[18] Coppola Decl. Exh. 10.

[19] See Zhan Depo. at p. 290, lines 23 - 25, p. 292, lines 7 - 9 (Coppola Decl. Exh. 11)

[20] See Zhan Depo. at p. 289, lines 4 - 11 (Coppola Decl. Exh. 11)

Moreover, Zhan also had dealt with these entities in the past. Indeed, his company had been sued for and accused of trademark infringement with respect to other goods he had imported into the United States by Tin Shing and New United.[21] Specifically, Zhan testified he was sued for copying the Soo Jing Bridge (Pearl River) brand for a mushroom soy sauce which he obtained from New United.[22] Mr. Zhan also admitted that he received cease and desist letters from a company named Pat Chun for sale of vinegar which infringed its trademark which he obtained from He Lin.[23]

Despite these facts, Zhan continued to do business with these companies and Mr. He Lin. Indeed, despite knowing that these sources were known to be suspect suppliers on the issue of providing infringing/counterfeit products, Mr. Zhan turned a blind eye to this fact and his prior legal disputes and continued to deal with the suspicious sources in order to import counterfeit Koon Chun Hoisin sauce. Such conduct raises similar issues to those discussed in *Nike*, 2005 WL 1654859 at *7.

These facts collectively establish Mr. Zhan's willful blindness to the fact that he was dealing with counterfeiters and warrants summary judgment on the issue.

//

//

//

---

[21] See Zhan Depo. at pp. 302, line 4 - 303, line 6; and pp. 308, line 1 - 310, line 8 (Coppola Decl. Exh. 11).

[22] See Zhan Depo. at p. 302, line 4 - 303, line 6 (Coppola Decl. Exh. 11).

[23] See Zhan Depo. at p. 308, line 1 - 310, line 8 (Coppola Decl. Exh. 11).

## V. CONCLUSION

Based upon the evidence and authorities, it is respectfully submitted that plaintiff's motion for summary judgment be granted in its entirety, together with all further and appropriate relief.

Dated: July 17, 2006

ABELMAN FRAYNE & SCHWAB

Lawrence E. Abelman (LA 6486)
Jeffrey A. Schwab (JS 9592)
Anthony A. Coppola (AC 3548)
666 Third Avenue
New York, New York, 10017
(212) 949-9022

Counsel for Plaintiff