UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
KOON CHUN HING KEE SOY & SAUCE
FACTORY, LTD.,

                              Plaintiff,

                                                                    MEMORANDUM &
              -against-                                              ORDER
                                                                    CV-04-2293 (SMG)
STAR MARK MANAGEMENT, INC.,
GREAT MARK CORP., and YI Q. ZHAN,

                              Defendants.
-----------------------------------------------------------X
Gold, S., *United States Magistrate Judge*:

## INTRODUCTION

          Plaintiff, Koon Chun Hing Kee Soy & Sauce Factory, Ltd. ("Koon Chun"), brings this

action against defendants for trademark infringement based upon defendants' sales of counterfeit

versions of plaintiff's hoisin sauce.  On January 8, 2007, the Honorable Joseph F. Bianco granted

in part and denied in part the parties' cross-motions for summary judgment.  Docket Entry 162

(hereinafter "M&O").  Judge Bianco found defendants liable for trademark and trade dress

infringement, 15 U.S.C. §§ 1114(1) and 1125(a), and unfair competition, 15 U.S.C. § 1125(a),

but denied plaintiff's motion for summary judgment on the question of whether defendants'

violation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, was willful.  Judge Bianco also denied

defendants' motion to preclude plaintiff from seeking to recover its lost profits.  Thereafter the

parties consented to have the case assigned to me for all purposes pursuant to 28 U.S.C.

§ 636(c)(1).  As defendants' liability has been established, the only issue remaining is a

determination of an appropriate award of damages and injunctive relief pursuant to Sections 1116

and 1117 of Title 15.[1]

<h1 align="center">BACKGROUND</h1>

Koon Chun is a Hong Kong company that manufactures and distributes sauces, seasonings and vinegars. Koon Chun owns a U.S.-registered trademark "Koon Chun Sauce Factory," which it uses on all of its products, including its hoisin sauce. Tr. 42-43.[2] Raymond Wing Chong Chan, Koon Chun's regional manager for the Americas, testified at trial that all of Koon Chun's products are manufactured in Hong Kong. Tr. 38. Koon Chun sauces have been marketed in the United States since the 1920s. *Id.* According to Chan, Koon Chun is a premium brand, and its hoisin sauce is the most expensive and the top-selling hoisin sauce on the market. Tr. 48.

In March, 2002, defendants, a New York-based distributor of Asian food products and two companies through which he conducted business,[3] purchased 350 cases of genuine Koon Chun hoisin sauce through one of their suppliers. Tr. 414-15. Each case contained six 5-lb. cans of hoisin sauce. This was the only purchase of authentic Koon Chun hoisin sauce by defendants. Defendants contend that they did not make any profit selling these cases because they paid such a

---

[1] Plaintiff has also asserted a state law claim under the New York General Business Law and common law claims of unfair competition and trademark infringement. Am. Compl. Fifth, Sixth, and Seventh Claims for Relief, Docket Entry 22. These claims, however, were not referred to in the relevant sections of the Pretrial Order, Docket Entry 205 at 6-7, or in plaintiff's post-trial memoranda, Docket Entries 215 and 219, and were not specifically raised at trial. I therefore consider these claims, which in any event largely overlap with the federal claims discussed below, abandoned, and order that they be dismissed.

[2] "Tr." refers to the transcript of the bench trial held beginning November 27, 2007 through December 4, 2007.

[3] Defendant Zhan is the president of the corporate defendants Star Mark Management Inc. and Great Mark Corporation. Both corporations operate out of the same building in Brooklyn.

high price for them. Tr. 425-26. Beginning in August, 2002, however, defendants began purchasing additional cases of Koon Chun hoisin sauce through their Chinese suppliers. Defendant Zhan testified that he believed these were cases of authentic Koon Chun hoisin sauce even though the price-per-case was substantially less than he had previously paid. Zhan explained that his suppliers told him they were able to sell at a reduced price because the Koon Chun hoisin sauce was made in mainland China as opposed to Hong Kong. Tr. 437-38, 445. Over the course of the next two years, defendants purchased thousands of cases of counterfeit Koon Chun hoisin sauce, although the exact number is in dispute.

In September, 2003, plaintiff discovered that counterfeit products bearing the Koon Chun trademark were being sold in the United States and hired a private investigator to determine the source of the counterfeiting. On April 3, 2004, plaintiff's investigator purchased two cans of counterfeit Koon Chun hoisin sauce from defendants. Tr. 54-55, 108. On June 14, 2004, pursuant to an Order of Seizure, Koon Chun seized 103 cases of counterfeit Koon Chun hoisin sauce from defendants. Tr. 56-58, 70. Plaintiff then learned of an additional shipment of counterfeit hoisin sauce due to arrive and, upon inspection in July, 2004, seized 680 cases from defendants' warehouse. Tr. 75-76.

## DISCUSSION

A plaintiff in a trademark or trade dress infringement case may elect to recover either actual or statutory damages. 15 U.S.C. § 1117. A plaintiff who elects to recover actual damages, as Koon Chun has here, is entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action," subject to the principles of equity. *Id.* § 1117(a). If plaintiff further establishes that defendants intentionally used plaintiff's trademark to sell

counterfeit Koon Chun hoisin sauce, the court "*shall*, unless the court finds extenuating circumstances, enter judgment for three times [defendants'] profits or [plaintiff's] damages, whichever is greater, together with a reasonable attorney's fees." *Id.* § 1117(b) (emphasis added).

Koon Chun seeks an award of defendants' profits, plaintiff's lost profits, plaintiff's costs for anti-counterfeiting measures and corrective advertising, and attorney's fees. In addition, Koon Chun asks for treble damages pursuant to § 1117(b) for defendants' willful violation of its trademark. From November 27, 2007 through December 4, 2007, I conducted a bench trial on the issue of the profits earned by defendants and the damages sustained by Koon Chun due to defendants' infringement. The parties subsequently submitted post-trial memoranda. I discuss each aspect of plaintiff's requested damages award below. Having considered the evidence presented and the arguments of counsel, I make the following findings and conclusions.

1.      *Defendants' Profits*

In establishing defendants' profits, plaintiff need only prove defendants' sales; defendants must then establish any costs and deductions. 15 U.S.C. § 1117(a). Moreover, if "the amount of the recovery based on profits is either inadequate or excessive, the court may in its discretion enter judgment for such sum as the court shall find to be just . . . ." *Id.*

Defendants concede that they sold a minimum of 4,590 cases of counterfeit hoisin sauce. Def. Mem. 1.[4] Defendants acknowledge only those sales of counterfeit sauce reflected in their QuickBooks computer records. Plaintiff, however, based upon its review of additional

_____

[4] "Def. Mem." refers to Defendants' Post-Trial Memorandum of Law, Docket Entry 214.

documentation, contends that defendants sold at least 7,875 cases of counterfeit hoisin sauce.

At trial, plaintiff presented the expert testimony and report of Thomas Neches, a certified public accountant. Tr. 509 *et seq.*; Neches Report.[5] To calculate the number of cases of counterfeit sauce sold by defendants, Neches culled information from a variety of sources, and relied primarily on: 1) documents seized from defendants' offices on June 14, 2004, 2) invoices printed by defendants on May 26, 2005, 3) other documents obtained on May 26, 2005, 4) defendants' interrogatory answers, and 5) defendants' QuickBooks computer records.[6] Neches Report 26; Tr. 519-24. Neches testified that he found many inconsistencies in the information he gleaned from these various sources, which made it difficult to determine the actual number of cases of counterfeit hoisin sauce imported and sold. Tr. 519-24. In particular, he opined that defendants' computer records were not complete and accurate. *Id.* at 519-24, 605-06; Neches Report 27-29; *see also* Tr. 542-43 (Neches' testimony concerning the unreliability of defendants' income statements in QuickBooks). For example, Neches conducted an inventory analysis based on defendants' QuickBooks records, only to find that those records reflected periods when defendants had negative inventory, i.e., they were selling sauce, even though they did not have any of it in stock at the time. Tr. 519-24, 605-06; Neches Report 28 and Ex. M.

After completing his review, Neches concluded that defendants had likely received a total of 9,008 cases of hoisin sauce. Neches Report Ex. R. Neches, however, subtracted 1,133 cases before calculating damages, leaving a total of 7,875 counterfeit cases plaintiff alleges defendants

---

[5] "Neches Report" refers to plaintiff's Amended Expert Report of Thomas M. Neches, CPA, dated August 10, 2006, Plaintiff's Trial Exhibit 162.

[6] Neches also examined other documents, including customs declarations provided by defendants' customs broker. *See* Neches Report 2-3.

sold. The subtracted cases include defendants' purchase of 350 cases of genuine Koon Chun

hoisin sauce, 103 cases of counterfeit hoisin sauce seized on June 14, 2004, and 680 cases of

counterfeit sauce seized in July, 2004. *Id.* at 30.

I found Neches' testimony to be credible and his methodology reasonable. Moreover,

Neches' testimony persuades me that defendants' computer records are not completely accurate

and reliable. Thus, I reject defendants' argument that no sales should be included unless

confirmed by their QuickBooks records, and, with the exceptions discussed below, accept

Neches' calculation of the number of cases sold.

Defendants contest the following shipments, totaling 4,418 cases, that plaintiff's expert

included in his calculation of defendants' profits: 1,200 cases ordered on or about February 11,

2003; 15 cases ordered or packed on or about June 3, 2003; 1,500 cases packed on or about

August 16, 2003; 700 cases packed on or about April 3, 2004; 1,000 cases packed on or about

May 16, 2004; and 3 unexplained, miscellaneous cases.[7] *See* Yi Report 4.[8] At trial, defendants

attempted to demonstrate that Neches had no basis for concluding that these were "likely cases"

and including them in his total.[9] Defendants ground their argument on their contention that

Neches included some, but not all, similarly documented cases in his analysis, and his inclusion

---

[7] 9,008 (the number of cases that plaintiff alleges that defendants imported) minus 4,418 (the number of cases identified in the text) equals 4,590. As noted above, defendants concede they sold 4,590 cases of counterfeit Koon Chun sauce.

[8] "Yi Report" refers to defendants' Expert Report of Songlin Yi, CPA, MBA, dated February 12, 2007, Defendants' Trial Exhibit BBB.

[9] After reviewing all documents concerning the importation of Koon Chun hoisin sauce, Neches created a chart and calculated the number of "likely cases" of imported hoisin sauce, eliminating references to cases in documents that appeared to be duplicative or that concerned orders that were never completed. Neches Report 29 and Exs. Q, R.

of some cases as likely therefore seems arbitrary. Tr. 623-31. Defendants' argument, however, is misplaced. For example, at trial, defendants asked Neches why he did not include the cases identified in Defendants' Exhibit A140, Bates Stamp SM355, in his calculation, and Neches was unable to explain. *See* Tr. 623, 626-27. Defendants then pointed out other examples of "likely cases" that Neches included and argued that Neches could not satisfactorily explain why they were included but the cases identified in Defendants' Exhibit A140 were not. *See* Tr. 624-31. In fact, however, Neches' report explains that the cases identified in Defendants' Exhibit A140 were not included because they were crossed out and replaced by other products on some copies of the identical packing lists. *See* Neches Report Ex. R (excluding cases identified in SM355 because they were crossed out on other copies of the same packing list identified as SM364 and SM368). If probative of anything, this example demonstrates the care Neches took to compare multiple copies of the same document, and to include cases only when those multiple copies consistently reflected that they were shipped or packed for shipment. Moreover, defendants' argument, even if it were based on an accurate reading of the documents, would establish only that Neches had overlooked evidence of likely cases and that the total he calculated *understated* the number of cases defendants sold. Accordingly, I find that plaintiff has established that the majority of the 4,418 disputed cases, with the exception of 520 cases discussed below, were "likely cases," and should be included in the calculation of defendants' unjust profits.

Plaintiff has failed to establish that a total of 520 cases were likely shipped to defendants on February 11, 2003 and in June, 2004. First, on or about February 11, 2003, plaintiff contends that 1,200 cases were shipped to defendants based on an order form defendants sent to their

supplier. *See* Bates Stamp SM685, SM687, SM689, SM690, Pl. Ex. 265.[10] Although the order separately requested 600, 400, 600, 300, and 200 cases (for a total of 2,100 cases) of hoisin sauce, plaintiff included only 1,200 cases as "likely," recognizing that one of the orders for 600 cases and the order for 300 cases were crossed out. In addition, however, the order for 200 cases of hoisin sauce also appears to be crossed out.[11] Accordingly, I decline to include these 200 cases in the number of "likely cases."

The second shipment in issue is the last order for hoisin sauce dated May 16, 2004. Plaintiff, relying on an order form, argues that defendants ordered and received 1,000 cases. *See* Bates Stamp SM518. Defendants, pointing to a bill of lading that appears to reflect the shipment of the ordered merchandise, contend that they received only 680 of the 1,000 cases they ordered. *See* Bates Stamp SM519, Pl. Exs. 267, 267B. The bill of lading supports defendants' position. Moreover, plaintiff took custody of 680 cases on July 2, 2004, shortly after the shipment in issue arrived in the United States. Plaintiff argues that defendants must have sold 320 cases before it could seize the shipment, but this suggestion is questionable in light of the bill of lading. Accordingly, I decline to include the 320 cases in the number of "likely cases."

Subtracting these 520 cases from Neches' calculation of a total of 7,875 "likely cases," I find that plaintiff has established that defendants sold 7,355 cases of counterfeit Koon Chun hoisin sauce. Now I must determine defendants' profits from these sales. Neches calculated that

---

[10] "Pl. Ex." refers to Plaintiff's Trial Exhibits.

[11] There is some ambiguity about whether the 200 cases were crossed out, as the marking on the order form could be interpreted as an underline. I conclude, however, that it was crossed out. I also note that defendants' English translation of Bates Stamp SM685, SM687, SM689, SM690 has all of the cases crossed out, although they are clearly not all crossed out on the Chinese version of the document. *See* Defendants' Trial Exhibit F61-64.

defendants' average sales price for a case of counterfeit Koon Chun hoisin sauce was $20.55. Neches Report 30-31 and Ex. L. After subtracting the average purchase cost, freight costs, and customs duties, Neches opined that defendants' average profit per case was $3.76. *Id.* at 31; Tr. 541. Defendants contend that additional costs should be subtracted before calculating the profits, including rent, telephone, utilities and "other overhead costs." Yi Report 5. These are all fixed overhead costs, however, that do not reduce defendants' profits in this case because they would have been incurred even if defendants never bought or sold any counterfeit hoisin sauce. *See The Apollo Theater Found., Inc. v. Western Int'l Syndication*, 2005 WL 1041141, at *11 (S.D.N.Y. May 5, 2005) (noting that a defendant must prove that a cost or expense it seeks to deduct is attributable to its unlawful sales). *See also* Tr. 530-31, 541 (Neches' testimony on defendants' incremental profit).

Defendants also seek a deduction for sales commissions. Defendants, however, failed to present sufficient evidence that their sales personnel were actually paid commissions. *See* Tr. 771-990 (Zhan's direct testimony with no reference to commissions); *see also* Tr. 541-42 (Neches' testimony that he did not see any evidence in defendants' records that defendants' sales personnel were paid commissions). Defendants did offer the deposition testimony of Kwun Leung, a salesperson who stated that he was paid a commission of 1.5%. Leung Dep. Tr. 66. Defendants' expert relied on this testimony as a basis for calculating commissions as an expense to be deducted before calculating defendants' profits. Yi Report 6. Leung further testified, however, that his commissions were reduced over time. Leung Dep. Tr. 66. Moreover, defendants offered no evidence about whether other sales personnel were paid commissions or in what amount, or any documentary evidence that any commissions were paid at all. As noted

above, defendants bear the burden of proving their costs and deductions. *See* 15 U.S.C. § 1117(a). For the reasons described above, I find that Leung's testimony is insufficient to meet this burden, and I therefore conclude that no deduction for commissions is warranted.

Accordingly, I find that defendants earned $3.76 in profits per case of counterfeit hoisin sauce sold. I therefore calculate defendants' total profits to be $27,654.80 (7,355 cases x $3.76).

Defendants' suppliers either credited them $10,000 or paid them $10,000 cash (for a total of $20,000) for litigation costs and to reimburse them for seized counterfeit hoisin sauce. Tr. 777-82. Although plaintiff seeks to have these amounts included in the calculation of defendants' profits, the amounts are not properly characterized as "profits" from sales of any infringing hoisin sauce under § 1117(a). This is so because only defendants' per-case costs were deducted from their selling price to calculate their profits. The amount paid by defendants for sauce that was seized was not deducted from their sales revenues, and reimbursement of some or all of that amount therefore does not constitute profits. Similarly, a contribution to the costs of defending this lawsuit has no bearing on defendants' profits. Accordingly, I decline to include the $20,000 as part of an award of defendants' profits.

2.    *Plaintiff's Lost Profits*

In addition to defendants' unjust profits, plaintiff seeks an award of its lost profits and argues that, but for defendants' infringement, plaintiff would have sold the same number of cases of hoisin sauce as defendants did. Neches Report 33. As noted above, § 1117(a) provides for an award of plaintiff's damages in addition to an award of defendants' profits. A calculation of plaintiff's damages may include its lost profits. *See Int'l Star Class Yacht Racing Ass'n v. Tommy Hillfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir. 1996). Although a court may engage in

"some degree of speculation," a plaintiff must establish its lost profits with specificity.  *The Apollo Theater Found.*, 2005 WL 1041141, at *11; *see also Int'l Star Class Yacht Racing*, 80 F.3d at 753 (affirming that plaintiff is not entitled to recover its actual damages where it offered no evidence of its losses).

Plaintiff has not established that it lost any sales of Koon Chun hoisin sauce due to defendants' infringement.  Although plaintiff presented evidence that some of defendants' customers also purchased other (legitimate) Koon Chun products from defendants at the same time that they purchased the counterfeit Koon Chun hoisin sauce, plaintiff has not demonstrated that it would have sold *any* legitimate Koon Chun hoisin sauce to defendants' customers at the higher prices it charged for its sauce.  Plaintiff declined to put forth any evidence of changes in its sales volume, which might have established that it lost sales.  Although Judge Bianco warned that plaintiff, having refused to produce evidence of any decline in sales, would have to "provide some other basis from which the Court could estimate revenue lost due to infringing conduct," M&O 20, plaintiff failed to do so.  For example, plaintiff did not present testimony from any of its customers indicating that they stopped purchasing plaintiff's hoisin sauce and instead bought defendants' counterfeit Koon Chun hoisin sauce.  Moreover, although it had ample access to defendants' records, plaintiff never offered evidence that any of the customers who purchased counterfeit sauce from the defendants had ever previously bought genuine Koon Chun hoisin sauce.  Indeed, given that defendants paid lower prices for the counterfeit sauce than their competitors paid for authentic Koon Chun sauce,[12] it is reasonable to believe that customers

---

[12] According to plaintiff's expert, defendants paid, on average, $15.23 per case for counterfeit Koon Chun sauce, while importers of genuine Koon Chun sauce paid $16.99 per case. Neches Report 31, 33; Tr. 532, 558-59.

willing to pay the lower prices defendants were able to offer might not have purchased genuine Koon Chun, a premium brand, if defendants' counterfeit products were not available, but would have opted instead for a less expensive brand of sauce. Accordingly, I find that plaintiff has failed to meet its burden of proof with respect to its lost profits and I decline to include lost profits in my award.

*3.     Trebling*

As noted above, trebling of defendants' profits is mandatory if the court finds that defendants' actions were willful, absent extenuating circumstances. 15 U.S.C. § 1117(b). As Judge Bianco already noted in his Memorandum & Order on the summary judgment motions, "[t]he standard for willfulness is whether the defendant had knowledge that [his] conduct represented infringement or perhaps recklessly disregarded the possibility." M&O 17 (quoting *Nike, Inc. v. Top Brand Co. Ltd.*, 2005 WL 1654859, at *12 (S.D.N.Y. July 13, 2005)) (internal quotation marks omitted).

As a threshold matter, defendants argue that plaintiff must establish any willfulness by clear and convincing evidence. Def. Mem. 2-6. Defendants contend that this heightened standard is the law of the case. *Id.* at 2-4.

"[L]aw of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S. Ct. 1382, 1391 (1983) (citation omitted); *see also Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) (noting that the "doctrine is admittedly discretionary"). A prior decision should not be re-examined "absent cogent or compelling reasons," *Pescatore*, 97

F.3d at 8 (internal quotation marks and citation omitted), such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice," *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citation omitted).

> The focus . . . is whether, in choosing not to apply the doctrine, the party seeking the benefit of the doctrine is prejudiced, where the term 'prejudice' refers to a lack of sufficiency of notice or a lack of sufficient opportunity to prepare armed with knowledge that the prior ruling is not deemed controlling.

*de Venustas v. Venustas Int'l LLC*, 2008 WL 619028, at *2 (S.D.N.Y. Mar. 5, 2008).

The law of the case doctrine does not apply here. First, Judge Bianco never actually ruled on the proper standard to apply. Rather, defendants argued that willfulness must be found by the clear and convincing standard in their opposition to plaintiff's motion for summary judgment. Plaintiff did not disagree, and Judge Bianco appears to have accepted that this heightened standard applied during oral argument on the summary judgment motions. *See* Transcript of Proceedings before the Honorable Joseph F. Bianco, Dec. 8, 2006, 14-16, Defendants' Trial Exhibit YY. At the conclusion of the oral argument, Judge Bianco reserved decision and made no rulings. The Judge subsequently announced his decision in the form of an extensive written opinion. The M&O Judge Bianco issued is silent with respect to the standard he applied when deciding to deny plaintiff's motion for summary judgment on the question of willfulness. M&O 16-19.

Second, defendants would not be prejudiced by application of a preponderance standard because they knew prior to trial that the applicable standard of proof was disputed. In the joint pretrial order, defendants argued that plaintiff must establish defendants' willfulness by clear and

convincing evidence.  *See* Joint Pre-Trial Order 7, Docket Entry 205.  At the start of the trial, the

issue came up again when defendants noted Judge Bianco's comment during oral argument about

the clear and convincing standard and plaintiff argued that a preponderance standard applied.  Tr.

4-6.  Thus, defendants were on notice prior to trial that whether the heightened standard applied

was in dispute, had ample opportunity to defend based on the lesser preponderance standard, and

would not be prejudiced if the preponderance standard were applied.

Finally, plaintiff's position on the applicable standard of proof is correct as a matter of

law.  The legislative history of the treble damages provision, as plaintiff notes, specifically

discusses the preponderance standard:

> The elements of proof in a civil suit under this Act will be the same
> as in a criminal prosecution: the plaintiff must establish that the
> defendant intentionally trafficked or attempted to traffic in goods
> or services knowing them to be counterfeit.  Of course, the
> standard of proof in a civil case will be by a preponderance of the
> evidence, rather than beyond a reasonable doubt.

S. Rep. No. 98-526, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3640.  Moreover, this

court is not aware of *any* Second Circuit case law that supports a heightened standard, and

defendants have cited none.  *See*, *e.g.*, *Cartier v. Symbolix, Inc.*, 544 F. Supp. 2d 316, 318-19

(S.D.N.Y. 2008) (no mention of a heightened standard when awarding treble damages under

§ 1117(b)); *Century 21 Real Estate LLC v. Paramount Home Sales, Inc.*, 2007 WL 2403397, at

*5 (E.D.N.Y. Aug. 20, 2007) (same); *MuscleTech Research & Dev., Inc. v. East Coast

Ingredients, LLC*, 2007 WL 655755, at *7 (W.D.N.Y. Feb. 26, 2007) (same); *Tiffany (NJ) Inc. v.

Luban*, 282 F. Supp. 2d 123, 124-25 (S.D.N.Y. 2003) (same).  The cases defendants do cite are

not on point.[13]  *See* Def. Mem. 4-6.  For these reasons, I conclude that, even if Judge Bianco had

held that the clear and convincing standard applied, there would be a compelling reason not to

adhere to that decision.

In any event, the proof adduced by plaintiff would satisfy even a clear and convincing

evidence standard.  The record here amply demonstrates defendants' intentional trafficking in

counterfeit goods.  In particular, the evidence establishes that Zhan was personally involved in

the counterfeiting of Koon Chun hoisin sauce.

Perhaps the most persuasive evidence that Zhan knew the hoisin sauce was counterfeit is

a letter Zhan wrote to a Chinese supplier dated January 15, 2003.  Pl. Ex. 111, 111A.  In the

letter, Zhan indicates that defendants will purchase 3,000 to 5,000 cases of Koon Chun hoisin

sauce if the price can be lowered.  Zhan goes on to state in the letter as follows: "The taste must

be similar.  It would be good if the paper box can be made harder.  It would be better if the

'nutrition facts table' can be printed on it!"  *Id.*  At trial, though, when asked whether he had

---

[13] Defendants argue that the First Circuit affirmed a district court's jury instruction requiring clear and convincing evidence of willfulness.  Def. Mem. 4 (*citing Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23 (1st Cir. 2002)).  The First Circuit, however, did not rule on the proper standard for willfulness but simply noted the standard the district court applied as procedural background.  *Tamko Roofing*, 282 F.3d at 29.  Similarly, without any discussion, a district court in Oregon in *Collegenet, Inc. v. XAP Corp.*, 483 F. Supp. 2d 1058, 1065 (D. Or. 2007), required a finding of willfulness under the Lanham Act by clear and convincing evidence and cited *Tamko Roofing*; *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 208 (3d Cir. 1995); and *Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 341 & n. 8 (D.N.J. 2001).  *Versa Products*, however, holds that clear and convincing evidence is required when establishing *likelihood of confusion* under the Lanham Act. 50 F.3d at 208.  Finally, defendants cite *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1440 (Fed. Cir. 1988), for the proposition that "[t]he jurisprudence . . . uniformly requires clear and convincing evidence in support of" a finding of willfulness in a trademark infringement action.  *E.I. du Pont*, however, was a patent infringement case, not a trademark infringement action.  For all these reasons, I do not find the cases cited by defendants to be persuasive.

15

examined the boxes and labels that were the subjects of his complaints, Zhan acknowledged that he had not; indeed, Zhan testified that he never looked at a can of hoisin sauce and never tasted the hoisin sauce, explaining that, when he wrote the letter, he was merely passing on a customer complaint.  Tr. 444, 849, 945-52.

I do not find Zhan's testimony in this regard credible.  It is difficult to believe that Zhan would forward customer complaints about packaging and labeling without first examining the packages and labels his customers were complaining about.  In addition, if Zhan were truly reporting a customer complaint concerning the taste and the labeling, and he believed that the sauce was authentic, he would most likely have complained directly to Koon Chun and not to his suppliers.  In addition, Zhan's use of the phrase, "the taste must be similar," underscores the inference that he knew he was writing to counterfeiters; the phrase begs the question, "similar to what?"  Finally, it strains credulity to think that a relatively small retailer like defendant Zhan would believe that he could influence an established, top-selling manufacturer of premium products like Koon Chun to alter its quality controls or manufacturing processes or change its labeling or packaging.  It is far more likely, on the other hand, that such matters would be discussed by a distributor of counterfeit goods and his source of supply.  In short, I find this letter to be strong evidence of defendants' knowing infringement of Koon Chun hoisin sauce.

When Zhan testified – incredibly – that he never inspected the boxes or labels of the less expensive, complaint-provoking hoisin sauce, he had a compelling motive to fabricate.  That is because, when asked why he thought he was able to purchase what he claims he believed to be authentic Koon Chun products at prices substantially lower than he originally paid, Zhan testified that he was told that the cheaper sauce was manufactured in China rather than Hong Kong.  Tr.

932. The boxes of counterfeit products, however, plainly indicate that the sauce was made in Hong Kong. Pl. Ex. 154. Thus, to accept Zhan's contention that he did not know the hoisin sauce was counterfeit, one must believe that he never noticed the markings on the boxes of counterfeit sauce, even though he wrote a letter to his supplier complaining about the quality of the boxes.

At a minimum, Zhan should have been alerted to the counterfeit nature of the sauce after he received complaints about the taste of the sauce in the second, cheaper shipment but none about the first shipment of legitimate Koon Chun hoisin sauce. Tr. 937-39, 946. Even if I were to believe that Zhan never saw the words "Made in Hong Kong" on the boxes of counterfeit sauce, his failure to investigate and learn readily discernible facts, especially in light of the differences in price and taste he concededly did know about, constitutes willful blindness to the fact that the sauce he purchased was counterfeit.

My conclusion that Zhan's testimony is incredible, and that he knew he was dealing in counterfeit sauce, is bolstered by the fact that Zhan is a well-educated, experienced businessman who has had repeated prior exposure to counterfeiting. Zhan, a United States citizen who came to the United States in 1989, holds a bachelor's degree in English literature from a university in China and took college courses in this country as well. Tr. 370-71, 850. Zhan has been in the business of importing food products since 1993, Tr. 854, and through his businesses, has been the subject of infringement complaints and become aware of the prevalence of counterfeiting. *See* Pl. Ex. 221 (2002 letter to defendants concerning potential trademark infringement of Pat Chun sauces); Pl. Ex. 220 (docket sheet of 2001 lawsuit against defendants' predecessor corporation for copyright infringement); Pl. Ex. 113A (2002 letter from Zhan to his supplier with

design for a Pat Chun label) and Tr. 466-68, 811-12 (Zhan's testimony that he did not believe he was infringing Pat Chun's trademark because he believed his sauce was "different" and that he was not aware that Pat Chun was a registered mark). In fact, in one prior lawsuit, Zhan was accused of selling counterfeit soy sauce supplied by one of the same companies that sold defendants the infringing hoisin sauce at issue in this case. Pl. Ex. 216; Tr. 436, 457.

In addition, defendants' business practices and conduct prior to and throughout the litigation suggest an attempt to conceal infringing activity. For example, Zhan testified that it was his practice to destroy hard copies of invoices approximately one year after they were entered into defendants' QuickBooks records. Tr. 474-76. Plaintiff's expert testified, though, that the Internal Revenue Service requires businesses to retain hard copies of records for three years. *Id.* at 584-85. As another example, after this lawsuit was filed, defendants changed their QuickBooks code for hoisin sauce, merging the hoisin sauce with another product and making it more difficult to ascertain the amount of hoisin sauce they imported and sold. *See id.* at 521-22, 824-25; Neches Report 19-20. Plaintiff's expert also testified that defendants' customs declarations for Koon Chun hoisin sauce actually indicate importation of Koon Chun soy sauce, thereby undervaluing the goods and the amount of hoisin sauce imported. Tr. 536-40. In general then, the evidence suggests that defendants did not keep accurate and reliable documents needed to run the corporations, and deliberately altered their record-keeping practices in an effort to conceal their involvement with counterfeit hoisin sauce. *See*, *e.g.*, *id.* at 520-22; Neches Report Ex. M (inventory report for hoisin sauce indicating periods of negative inventory).

Finally, Zhan's testimony overall reflected a general lack of credibility. *See*, *e.g.*, Tr. 489-90, 496-503 (Zhan's testimony attempting to explain the discrepancy between the QuickBooks

gross profits of over $2 million, Pl. Ex. 270, and the corporate tax returns, Pl. Ex. 271, which indicate only about one tenth of that amount in profits); *id.* at 483-89 (Zhan's testimony attempting to explain the discrepancies between the tax returns and other testimony concerning the ownership of the corporations and acknowledging that he followed his accountant's advice to "use my wife's name for tax purposes" because "I owned so many companies," Tr. 488); *id.* at 831-35 (Zhan's testimony concerning his changed answers to interrogatories about how many cases of counterfeit hoisin sauce defendants sold). For all these reasons, I find that plaintiff has established, even by clear and convincing evidence, that defendants acted willfully in violating the Lanham Act and are thus subject to treble damages.

Section 1117(b) provides that trebling is not required if "the court finds extenuating circumstances." Defendants argue that Zhan's personal circumstances, the defendants' minimal sales and profits from the counterfeit hoisin sauce, and the plaintiff's actions throughout this litigation warrant a finding of extenuating circumstances. Def. Mem. 17-19. None of these are significant "extenuating circumstances" warranting a reduction in damages.

"Congress has indicated that 'it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit can show that he or she should not be assessed treble damages.'" *Fendi S.a.s. Di Paola Fendi E Sorelle v. Cosmetic World, Ltd*, 642 F. Supp. 1143, 1147 (S.D.N.Y. 1986) (quoting Joint Explanatory Statement, 130 Cong. Rec. H12076, 12083 (Oct. 10, 1984)); *see also Nike*, 2005 WL 1654859, at *12; S. Rep. No. 98-526, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3627, 3628. However, "[w]here the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her

family,' treble damages may be inappropriate." *Fendi*, 642 F. Supp. at 1147 (quoting Joint Explanatory Statement, 130 Cᴏɴɢ. Rᴇᴄ. H12076, 12083 (Oct. 10, 1984)).

Although defendants argue that their sales and profits were minimal, the corporations' own records indicate that they were multi-million dollar businesses. *See* Pl. Ex. 270. In addition, Zhan testified that Star Mark sold approximately 1,000 different food items in 2002. Tr. 855. And, as noted previously, Zhan has been an importer since 1993 and is a sophisticated businessman with knowledge of trademark rights. Clearly, defendants do not meet Congress' definition of extenuating circumstances.

Defendants also contend that Zhan's personal circumstances are such that treble damages might leave Zhan "unable to support his family." Def. Mem. 18; Tr. 850-53. Although Zhan may well have pressing family responsibilities, he refused to produce in discovery various records relevant to his personal financial circumstances. Tr. 850-53, 986-88. Accordingly, I am unable to conclude that Zhan would be "unable to support his family," and is entitled to avoid treble damages on that basis. Finally, I do not find anything in plaintiff's litigation conduct that justifies a deviation from the mandatory treble damages.

In sum, I find that defendants have failed to establish extenuating circumstances that would warrant an exception to the treble damages provision in § 1117(b). Accordingly, plaintiff is awarded $82,964.40, or three times defendants' profits.

4.    *Corrective Advertising*

Plaintiff seeks $54,340 for prospective corrective advertising to combat defendants' infringement. "To recover under a claim for 'prospective corrective advertising,' a plaintiff 'must show that it was financially incapable of undertaking effective concurrent corrective

20

advertising measures to counteract' the trademark infringement." *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *2 n.2 (S.D.N.Y. Aug. 6, 2007) (citation omitted). Moreover, it is an "extraordinary remedy and no court in this Circuit has ever awarded damages under that theory." *Id.* (internal citation omitted). Other than somewhat vague hearsay, Tr. 184-88, plaintiff offered no evidence of a need to correct any misinformation about its hoisin sauce in the marketplace, or why it was financially unable to do so after uncovering defendants' sales of counterfeit sauce. Accordingly, I decline to award plaintiff any corrective advertising costs.

5.      *Anti-Counterfeiting Measures*

Plaintiff seeks a total of $99,037 in costs for anti-counterfeiting equipment that plaintiff purchased and anti-counterfeiting measures that it implemented in response to the discovery of counterfeit Koon Chun sauces in the United States in 2004. Plaintiff, however, has not satisfactorily established that it incurred these anti-counterfeiting costs as a result of defendants' infringement.

While plaintiff is entitled to recover its actual damages, 15 U.S.C. § 1117, it must establish that those damages were caused by defendants' infringement. Plaintiff here has not established that its anti-counterfeiting costs are attributable to defendants' conduct in this case. Plaintiff was awarded $88,099.50 in anti-counterfeiting costs, or approximately half of what it claims to be its total anti-counterfeiting costs, in a trademark action in California. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, 2007 WL 328696, at *8 (N.D. Cal. Feb. 2, 2007). Plaintiff seeks to recover its remaining anti-counterfeiting costs from the three defendants in this case. The defendants in this action and the California case, however, are far

from the only defendants that Koon Chun has sued for infringement of its sauces. An ECF query

for the Eastern District of New York alone reveals six other actions by Koon Chun for trademark

infringement.[14]  Moreover, plaintiff has failed to present any evidence about how the number of

infringing cases distributed by the defendants in this case compares to the scope of the infringing

activity it claims to have uncovered.  Accordingly, it would be disproportionate, and potentially

result in a windfall to plaintiff, if half of its anti-counterfeiting costs were assessed against the

three defendants in this action.

Plaintiff's reliance on *Balance Dynamic Corp. v. Schmitt Industries*, 204 F.3d 683, 689-

93 (6th Cir. 2000), is misplaced.  In *Balance Dynamics*, plaintiff and defendant were competing

manufacturers of products that balance industrial grinders.  *Id.* at 686.  Defendant sent notices to

plaintiff's customers suggesting that plaintiff's product uses a gas harmful to the environment

and likely to be found to violate EPA standards.  The court awarded "damage control expenses,"

in the form of corrective advertising costs, because those expenses were directly caused by

defendant's Lanham Act violation.  The present case is thus distinguishable from *Balance

Dynamics* for several reasons.  First, defendant's violation in *Balance Dynamics* was for false

advertising and therefore there was a direct correlation between the violation (defendant's false

advertising) and the damage award (costs for corrective advertising).  Second, plaintiff was

injured by the actions of a single defendant.  In contrast, as discussed above, plaintiff here

acknowledges that there has been significant trademark infringement of its products in the United

States and defendants in this case are just three of many infringers.  Accordingly, it is impossible

---

[14] The docket numbers for Koon Chun's trademark actions in this district are 04-CV-5442 (JG), 07-CV-1444 (JFB), 07-CV-2568 (CPS), 07-CV-3224 (CPS), 07-CV-3781 (CPS), 07-CV-3880 (CPS).

to apportion the anti-counterfeiting costs for which defendants here are responsible. For these reasons, I decline to award plaintiff any anti-counterfeiting costs in this action.

6.      *Attorney's Fees*

Under the Lanham Act, "the court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Exceptional circumstances include willful infringement, and thus a "finding of willfulness determines the right to attorneys' fees." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995); *see also Nike, Inc. v. Top Brand Co.*, 2006 WL 2946472, at *3 (S.D.N.Y Feb. 27, 2006). Moreover, § 1117(b) states that reasonable attorney's fees are mandatory upon a finding that defendants acted willfully. As discussed above, I find that defendants' actions were willful, and an award of attorney's fees is therefore mandatory.

Plaintiff has not yet submitted its fee application. The parties are directed to meet and confer in an effort to agree on reasonable attorney's fees and costs and to advise the court of the terms of any agreement within three weeks of the date of this Memorandum & Order. If the parties are unable to agree, plaintiff shall submit its application for fees and costs within three weeks of the date of this Memorandum & Order. Defendants shall make any submission in response to plaintiff's application for fees and costs no later than two weeks after plaintiff's submission; any reply that plaintiff wishes to make is due one week after any submission by defendants. In its application, plaintiff shall submit contemporaneous time records that show "for each attorney, the date, the hours expended, and the nature of the work done," as required by *New York State Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).

7.    *Injunctive Relief*

Shortly after this action was filed, the parties stipulated to the entry of a preliminary injunction.  Docket Entry 16.  In both its amended complaint and the joint pretrial order, plaintiff seeks permanent injunctive relief pursuant to 15 U.S.C. § 1116.[15]  Although plaintiff does not specifically refer to injunctive relief in its post-trial memoranda, I presume that plaintiff still seeks entry of a permanent injunction.

Section 1116 authorizes courts to issue injunctions to prevent trademark and trade dress infringement.  15 U.S.C. § 1116(a).  To be entitled to a permanent injunction, a plaintiff must establish that

> (1) absent injunctive relief, it will suffer irreparable harm, and (2) actual success on the merits.  Plaintiff must also show the threat of a continuing violation in order to obtain permanent injunctive relief. . . .  Moreover, in this Circuit, proof of a likelihood of confusion establishes both likelihood of success on the merits and irreparable harm.

*Motorola, Inc. v. Abeckaser*, 2009 WL 962809, at *7 (E.D.N.Y. Apr. 8, 2009) (internal quotation marks and citation omitted).  *See also Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 299 (2d Cir. 1999) (requiring that a court find future likelihood of confusion as a prerequisite to permanent injunctive relief in a trademark infringement action).  As discussed above, plaintiff has made the required showing here.  First, having established that defendants sold counterfeit Koon Chun sauce, plaintiff has demonstrated a likelihood of confusion.  *Motorola*, 2009 WL 962809, at *5.

---

[15] In his M&O, Judge Bianco dismissed the Second Cause of Action in the Amended Complaint, a claim brought under § 1116.  As the M&O makes clear, however, he did so because he concluded that § 1116 does not provide an independent cause of action, and not because of any finding he made with respect to whether plaintiff is entitled to injunctive relief.  M&O 15-16.

*See also* M&O 12-15 (finding defendants' liable for violations of the Lanham Act, in part based upon a finding of likelihood of confusion). Moreover, defendant Zhan's long involvement in the business of importing foods, his repeated run-ins with infringement claims, and his lack of candor when testifying at trial, sufficiently demonstrate the threat of a continuing violation. Accordingly, a permanent injunction is warranted.

Plaintiff has not submitted a proposed permanent injunction for the court's consideration. The parties shall confer in an effort to agree on the terms of an injunction, perhaps using the preliminary injunction to which they stipulated as a starting point. Any agreement, of course, will be without prejudice to defendants' appellate rights. If the parties are able to agree, plaintiff shall submit their joint proposed injunction within three weeks of the date of this Memorandum and Order. If not, plaintiff shall submit its proposed injunction, together with a supporting memorandum if it so chooses, by that date. Defendants may submit their opposition no later than two weeks thereafter, and plaintiff may submit a reply within one week of defendants' submission.

## CONCLUSION

For all these reasons, plaintiff is awarded $82,964.40, an amount calculated by trebling defendants' profits of $27,654.80, pursuant to 15 U.S.C. § 1117(b). Plaintiff's state law and common law claims are hereby dismissed.

The parties are directed to meet and confer in an effort to agree on reasonable attorney's fees and costs and on a permanent injunction, and to advise the court of the terms of any agreement(s) within three weeks of the date of this Memorandum & Order. If the parties are unable to agree, plaintiff shall submit its application for fees and/or its proposed injunction

25

within three weeks of the date of this Memorandum & Order.  Defendants shall make any

submission in response no later than two weeks after plaintiff's submission.  Any reply that

plaintiff wishes to make is due one week thereafter.

**SO ORDERED.**

_____/s/_____

**STEVEN M. GOLD**
**United States Magistrate Judge**

Dated:          Brooklyn, New York
                   May 21, 2009